# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# OCALA DIVISION

CRISTY BRIGHT,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.

Case No.

## COMPLAINT FOR DAMAGES

Plaintiff Cristy Bright sues Defendant United States of America under the Federal Tort Claims Act (FTCA), and alleges as follows:

### Jurisdiction and Venue

1. This Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1346 and the FTCA, 28 U.S.C. § 2671, *et. seq.*

2. On or about March 9, 2022, Plaintiff filed a claim with the U.S. Bureau of Prisons (BOP) under the FTCA demanding damages of a set sum and has satisfied the jurisdictional prerequisites.

3. To date, neither Plaintiff nor her counsel has received a response to her claim and more than six months has passed since its filing.

4. Plaintiff has exhausted her administrative remedies and has otherwise performed all acts precedent to bringing this suit or such acts have been waived.

5.  Venue is proper in the Middle District of Florida under 28 U.S.C. §§ 1402(b) and 1391(b)(2) as the acts and omissions that are the subject of this complaint occurred within this District.

## Parties

6.  At all times material hereto, Plaintiff Cristy Bright was a federal prisoner confined in the women's minimum-security camp at Federal Prison Camp (FPC) Coleman, located in this District, and was formally under the custodial, supervisory, and disciplinary authority of BOP.

7.  At all times material hereto, Defendant United States of America owned, operated, maintained, and controlled BOP and the corrections facility known as FCI Coleman, including the women's minimum-security camp—FPC Coleman—where Bright was confined at all times material to this lawsuit. United States of America is the appropriate defendant under the FTCA.

8.  Defendant United States of America also employed Officer Phillip Tippett at FPC Coleman. At all times material, Officer Tippett was a law enforcement officer of the United States Government empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law pursuant to the law enforcement proviso in 28 U.S.C. § 2680(h) as interpreted by *Millbrook v. United States*, 569 U.S. 50 (2013).

9.  While employed by the United States of America through BOP, Officer Tippett was supervised by the Warden, associate wardens, executive staff, department heads, supervisors, and prison management (collectively, "Coleman

Management"), who were grossly negligent in the management, supervision, and retention of male correctional officers at FPC Coleman, including Officer Tippett, who were permitted to engage in sexual harassment and abuse to female prisoners.

10. The Special Investigative Services Unit (SIS) assigned to Coleman were responsible to investigate any alleged criminal activity involving staff members or inmates. SIS failed to timely investigate the criminal activity perpetrated by Officer Tippett identified below.

11. The Office of Internal Affairs (OIA), the Office of Inspector General (OIG), U.S. Department of Justice (DOJ), and many other special agents and supervisory attorneys (together, with SIS, OIA, OIG, and DOJ, the "Investigative Agencies") were responsible for the investigation and prosecution of male correctional officers sexually abusing female inmates at Coleman. These agencies failed to timely investigate and prosecute the criminal activity perpetrated by Officer Tippett.

## Common Allegations of Fact

12. Plaintiff Christy Bright is a federal prisoner currently housed at Federal Correctional Institution (FCI) Aliceville.

13. Prior to her incarceration at FCI Aliceville, Bright was imprisoned at FPC Coleman.

14. The Coleman federal prison is located in Sumter County, Florida, and houses approximately 6,000 federal inmates in both low and medium security facilities. The campus includes a minimum-security satellite prison camp housing

approximately 500 female inmates—FPC Coleman. Coleman federal prison is operated by the BOP through DOJ.

15. Female inmates at the FPC Coleman are segregated into distinct housing units with dormitory style cubicles for each inmate. The camp is operated under a work/camp model where non-violent inmates are afforded work privileges within the Coleman complex. Inmates are subject to daily "counts" but are otherwise free to move around the camp subject to specified rules and regulations.

16. These freedoms of movement allow inmates like Bright flexibility and autonomy. Because these inmates are not as strictly monitored as other prisoners, corrections officers have more opportunities to harass, abuse, and harm them.

17. FPC Coleman employs correctional officers, facilities staff and management to oversee and operate the prison facility. The correctional officers are trained, managed, overseen, and paid by BOP through DOJ serving "investigative or law enforcement" functions. The correctional officers are federal employees subjecting the United States of America to liability for improper actions committed within the course and scope of their employment.

18. Prior to Bright's arrival, there was a pattern of sexual abuse and harassment by male corrections officers against female inmates at FPC Coleman.

19. The Prison Rape Elimination Act (PREA)—which applies at BOP facilities including FPC Coleman—creates a zero-tolerance policy towards sexual abuse and harassment of prisoners.

20. Because female inmates are fully dependent on the correctional officers for necessities and privileges, all sexual contact of the inmate—with or without consent (and technically a prisoner cannot consent)—is classified as abuse under PREA, as set forth in 28 C.F.R. § 115.6.

21. Under that section, "sexual abuse" of an inmate by a staff member, contractor, or volunteer includes any of the following acts, among others, with or without consent of the inmate:

> (3) Contact between the mouth and any body part where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;
>
> (5) Any other intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh, or the buttocks, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;
>
> (6) Any attempt, threat, or request by a staff member, contractor, or volunteer to engage in the activities described in paragraphs (1) through (5) of this definition;
>
> (7) Any display by a staff member, contractor, or volunteer of his or her uncovered genitalia, buttocks, or breast in the presence of an inmate, detainee, or resident, and
>
> (8) Voyeurism by a staff member, contractor, or volunteer.

28 C.F.R. § 115.6.

22. The provision "voyeurism by a staff member, contractor, or volunteer" is defined to mean "an invasion of privacy of an inmate, detainee, or resident by staff for reasons unrelated to official duties, such as peering at an inmate who is using a

5

toilet in his or her cell to perform bodily functions; requiring an inmate to expose his or her buttocks, genitals, or breasts; or taking images of all or part of an inmate's naked body or of an inmate performing bodily functions." *Id.*

23. For purposes of PREA, the term "sexual harassment" is defined to include the following conduct and acts:

> (1) Repeated and unwelcome sexual advances, requests for sexual favors, or verbal comments, gestures, or actions of a derogatory or offensive sexual nature by one inmate, detainee, or resident directed toward another; and
>
> (2) Repeated verbal comments or gestures of a sexual nature to an inmate, detainee, or resident by a staff member, contractor, or volunteer, including demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures.

*Id.*

24. DOJ, BOP, Coleman Management, and the Investigative Agencies were on notice of sexual abuse and harassment claims against male corrections officers the camp through complaints, reports, as well as the lawsuit styled *Rachel Beaubrun et al. v. United States of America*, No. 5:19-cv-615-TJC-PRL—filed on December 3, 2019, in this District—in which several female prisoners sued Defendant United States of America for repeated sexual assault and abuse by several officers at FPC Coleman. *See* Romy Ellenbogen*, No consequences after Florida officers admit to sexually abusing inmates, lawsuit says*, TAMPA BAY TIMES (Sep. 17, 2020), https://www.tampabay.com/news/florida/2020/09/17/no-consequences-after-florida-officers-admit-to-sexually-abusing-inmates-lawsuit-says/.

6

25. Shortly after her arrival at FPC Coleman, in May 2020, BOP stationed Officer Tippett as a corrections officer assigned to Bright's F-3 dorm.

26. On information and belief, throughout his time as an officer at FPC Coleman, Tippett was routinely under the influence of Xanax, morphine, and hydrocodone pills.

27. Officer Tippett frequently slurred his words and had trouble remaining standing.

28. This behavior was reported by numerous federal prisoners to Coleman Management and SIS, but no action was ever taken.

29. After arriving at FPC Coleman, Officer Tippett began to frequently commit acts within the definitions of "sexual abuse" and "sexual harassment" in 28 C.F.R. § 115.6 against Bright.

30. On one occasion in May 2020, Bright was going to dinner when Officer Tippett called her over and told her "If we weren't on the yard right now, I'd bend you over and fuck the shit out of you."

31. Soon after that, Bright was going to dinner again when Officer Tippett attempted to call her over. She was scared due to their last interaction, so she put up a finger, said "hold on," and kept walking.

32. In response, Officer Tippett aggressively followed her, ripped her headphones off, and told her that when he says to do something, she needs to do it. He then walked away.

33. Later, as Bright was walking out of the dining hall, he approached her again, put his finger in her face and said when he asked her to come to him, she needed to do it and to never disrespect him again.

34. Bright tried her best to avoid Officer Tippett, but it was not always possible. He would seek her out at her job and offer her drugs to have sex with him. Often, he was slurring his words, clearly under the influence of drugs himself.

35. Officer Tippett's drug abuse on the compound was reported by numerous inmates to the Warden, SIS, and other prison officials, but nothing was done.

36. Officer Tippett was often very aggressive and threatening. He threatened to plant drugs on Bright if she didn't do what he told her to do.

37. Officer Tippett would smack Bright on the buttocks, grope her breasts in front of other prisoners, and order her to show him her breasts. The abuse was often witnessed by other officers at FPC Coleman.

38. Bright was particularly affected by the abuse because she had been a victim of abuse outside prison and was shocked to find that it followed her inside prison.

39. Similar instances continued at F-3 dorm until July 2020, when Bright contracted COVID-19 and was placed in the quarantine section of the facility.

40. Officer Tippett oversaw this section and his sexual harassment and abuse continued.

41. On one occasion, Officer Tippett stopped Bright as she was in a robe leaving the shower and told her to "bend over and pick up a piece of paper so I can see your ass."

42. Later that day, during afternoon count, Officer Tippett told Bright she had mail.

43. After evening count, Bright went to the message center and asked where her mail was. Officer Tippett came to the side and offered Bright a hit from his vapor cigarette. She declined and asked where her mail was.

44. Officer Tippett then leaned in and stuck his tongue down Bright's throat.

45. In shock, Bright pulled back and turned her head to spit in reaction.

46. When Bright turned around to face Officer Tippett, he had undone his pants and exposed his erect penis to her.

47. In even more shock, Bright immediately left to go back to the visiting room. Officer Tippett called out, "Please don't tell SIS on me" and mentioned he only had 14 years left until retirement. (Bright originally thought he said "four years" but later understood that it was 14 years to retirement.)

48. Bright returned to her quarantine area in distress. Another inmate, Belkys Martinez, noticed Bright's condition and asked what was wrong.

49. Bright refused to reveal any details of what occurred, but she asked Martinez to watch over her as she slept because she was scared.

50. Bright was fearful Officer Tippett would return to her bunk and rape her.

51. Martinez agreed to watch over her and the two prayed for protection before Bright fell asleep.

52. That night, Martinez watched Officer Tippett walk up to Bright's bed. He was about to kick it to wake her up, but he stopped when he saw that Martinez was watching.

53. The next day around 4 pm, Officer Tippett kicked Bright's bed and aggressively told her to "get up" during count. He did not do this to any other inmates.

54. Bright spent the rest of quarantine in fear that Officer Tippett would harm or rape her.

55. Upon returning to the F-3 dorm, Bright lived in constant fear of Officer Tippett, and his harassment continued.

56. During counts, Officer Tippett would intimidate Bright by staring directly at her.

57. Officer Tippett would ask Bright to walk around the track with him in front of other inmates. On one occasion he hit Bright in front of other inmates without provocation. Bright thought that he was under the influence of drugs at the time.

58. Some nights, Officer Tippett would walk into Bright's room and attempt to wake her by shining his light at her—she would hide under her blanket afraid that he was planning to rape her.

59. Officer Tippett once threatened her if she told anyone what had occurred when he forcibly kissed her and exposed his erect penis that he would plant drugs and a cell phone in her cube, which would result in punishment against her for violating the prison's rules.

60. Bright lived in a terror she could not escape—her abuser was not only present on a day-to-day basis, but he had control over her, abused his authority and terrorized her, and threatened her with loss of liberty and other consequences if she sought help.

61. Eventually, at wits' end, Bright confided in inmates Amber Theille, Peggy White, and Kelly Lewis regarding Officer Tippett's emotional, physical, and sexual abuse. They had already observed and knew what he was doing to her.

62. In response, Theille urged Bright to report what had occurred.

63. While Bright was in the hospital with pinkeye and couldn't see Theille wrote a statement for her that she had dictated. Officer Tippett was mentioned by name in the letter.

64. On August 15, 2020, Theille mailed the statement to Bright's lawyer.

65. On August 16, 2020, Theille reported to DOJ through Trulinks, "I think you should talk to Cristy Bright about an officer, but she is afraid of retaliation."

66. On August 18, 2020, Bright was abruptly put into the FCI Coleman Low men's facility's Medical Special Housing Unit (SHU), which is confinement, due to a falsified incident report, which claimed she had been emailing other inmates.

67. This report was later appealed and was dropped after Officer Tippett's death.

68. For 135 days—until December 30, 2020 when she was transferred to FCI Aliceville—Bright was kept in the SHU without reprieve in conditions that violated the Eighth Amendment.

69. Those conditions included male officers and inmates entering the area unannounced. While these men walked through, they had a clear view of the toilet and shower areas and took frequent advantage of the opportunity to observe Bright in the nude or using the facilities.

70. While she was in that facility, male inmates would often go to Bright's window and harass her yelling for her to "show us your tits and ass." Male inmates would shake their penis while looking at her. She complained to Lt. Thompson who replied, "They don't want you; they have boyfriends."

71. Bright's toilet was directly in front of the window and the shower curtain was clear from the waist up. Two inmates died while she was in the SHU.

72. Bright's prescribed Lexapro medication—for depression and anxiety—was stopped in November. She wrote to Warden Lane about the medication, but she never received it again while in the SHU. Medical staff called her a "whiney little

bitch" when she asked about receiving her approved and prescribed medication.

73. Bright also had no recreation or fresh air during her time in the SHU.

74. Bright was also exposed to COVID-19 when her bunkmate tested positive for it. Her bunkmate was never quarantined and was left in a cell with Bright, exposing Bright to COVID-19 again.

75. Bright's access to food and water was severely limited. She sometimes went days without food and water and would often only receive it when she pounded on the door. Her bread was often moldy and tap water was brown.

76. Bright often was denied shampoo and toilet paper.

77. On or about December 25, 2020, Officer Tippett brought a gun onto the Coleman compound and shot and killed himself.

78. At the time of his death, Officer Tippett was under investigation for Bright's allegation, which was reported to the *Tampa Bay Times* by Joe Rojas, southeast regional vice president for AFGE Council of Prisons. *See* Romy Ellenbogen, *Federal correctional officer in Florida died by suicide on Christmas at prison*, TAMPA BAY TIMES (Jan. 31, 2021), https://www.tampabay.com/news/florida/2021/01/13/federal-correctional-officer-in-florida-died-by-suicide-on-christmas-at-prison/.

79. Once Bright was released from the SHU just days after Officer Tippett's suicide, she was transferred to her current location FCI Aliceville in Alabama.

80. When Bright was transferred to Aliceville, she reported everything all over again, including how she was treated in confinement (SHU).

81. According to the BOP Special Investigative Supervisors Manual in effect from November 30, 2016, section 408 required SIS staff to "promptly refer inmates reported or suspected of being a victim of sexually abusive behavior by staff or inmates to Psychology Services for assessment of vulnerability and treatment needs…."

82. The Manual also states that "[i]f an inmate alleges that he/she was assaulted at another facility, the statement is taken with as much detail as possible and forwarded to that facility for investigation."

83. After arriving at Aliceville, Bright wrote a sensitive BP10 report to the regional office regarding her PREA issues, yet she never heard a response.

84. While seeing psychologist Dr. DeJesus after her arrival at FCI Aliceville, Bright again reported Officer Tippett's sexual abuse. Her complaint was rebuffed with the statement "99% of women who make these allegations are or were in relations with the officer."

85. Bright has continued to suffer emotional distress since the abuse she faced from Officer Tippett and feels that she has been "marked."

86. Bright's depression and anxiety have worsened, and she lives in a constant state of fear. She has not been provided with proper assistance or mental health treatment, but rather with contempt and insults.

87. Bright remains unaware of the outcome of the abuse reports that she made.

88. As a result of the continuous sexual harassment and abuse perpetrated by Officer Tippett, Bright has suffered extensive psychological trauma, physical trauma, depression, pain and suffering and is fearful for her safety. Bright demands compensation from the United States of America for this abuse in an amount to be determined at trial.

## COUNT I – Negligence

Plaintiff Cristy Bright incorporates and re-alleges the allegations set forth in paragraphs 1 through 88 above as if fully set forth herein.

89. As a federal prisoner in its custody, the United States of America, through BOP, the Investigative Agencies, and Coleman Management, owed a duty to Plaintiff to ensure that she "serve[d her] sentence[] of imprisonment in facilities that are safe, humane, cost-efficient, and appropriately secure, . . ."

90. The United States of America, through BOP, the Investigative Agencies, and Coleman Management, also owed a duty to Plaintiff to keep her free from sexual abuse and sexual harassment from corrections officers, including Officer Tippett.

91. The United States of America, through BOP, the Investigative Agencies, and Coleman Management, breached its duties to Plaintiff by providing Officer Tippett unrestricted one-on-one access to Plaintiff while incarcerated at FPC Coleman despite having received complaints of his conduct—including his drug use—and have knowledge of his past sexual abuse and harassment of female prisoners.

15

92. The United States of America, through BOP, the Investigative Agencies, and Coleman Management, breached its duties to Plaintiff by providing Officer Tippett unrestricted one-on-one access to Plaintiff while incarcerated at FPC Coleman despite knowing of a widespread pattern and practice of sexual harassment and sexual abuse and assault by male corrections officers against female prisoners that has been occurring systematically at FPC Coleman and which the United States of America, BOP, and Coleman Management were on notice of through complaints and lawsuits concerning these very issues prior to Plaintiff's arrival at FPC Coleman.

93. The United States of America, through BOP, the Investigative Agencies, and Coleman Management, breached its duties to Plaintiff by creating a system where victims of sexual abuse and harassment are punished for reporting sexual misconduct of prison staff through confinement and placement in special housing units, discipline, and transfer to more restrictive facilities, among other things.

94. The United States of America, through BOP, the Investigative Agencies, and Coleman Management, breached its duties to Plaintiff under PREA by: (a) failing to enforce a zero-tolerance policy; (b) failing to supervise and monitor one-on-one inmate/officer contact; (c) hiring, promoting, retaining officers who may have had improper sexual contact; (d) punishing sex victims with involuntary segregated housing and loss of privileges; (e) failing to report suspicion of sexual abuse; (f) failing to protect inmates from retaliation after reporting abuse; and (g) failing to discipline staff for sexual misconduct.

95. As a direct and proximate cause of the negligence outlined above, the United States of America, through BOP, the Investigative Agencies, and Coleman Management, caused damage to Plaintiff, including psychological trauma, emotional distress, depression, physical trauma, pain and suffering, great emotional harm, anguish, insecurity, self-revulsion, damage to her self-esteem and self-worth, shame and humiliation.

96. Plaintiff is entitled to damages from the United States of America under the Federal Tort Claims Act for the negligence of BOP, the Investigative Agencies, and Coleman Management, in an amount to be determined at trial.

**COUNT II – Assault and Battery**

Plaintiff Cristy Bright incorporates and re-alleges the allegations set forth in paragraphs 1 through 88 above as if fully set forth herein.

97. Officer Tippett, acting within the scope and course of his employment with BOP as an investigative or law enforcement officer of the United States Government empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law pursuant to the law enforcement proviso in 28 U.S.C. § 2680(h) as interpreted by *Millbrook v. United States*, 569 U.S. 50 (2013), engaged in the intentional assault and battery of Plaintiff through unwanted, nonconsensual sexual abuse and harassment as detailed herein, which acts and abuse were wrongful as a tort under the laws of Florida and the United States and without justification or excuse under any applicable state or federal statute or rule.

98. As a result of the abuse and harassment, Officer Tippett caused damage to Plaintiff, including physical trauma, invasion of her person, great emotional harm and distress, psychic anguish, insecurity, self-revulsion, damage to self-esteem, shame, humiliation, anxiety, and depression, for which the United States of America is liable under the Federal Tort Claims Act in an amount to be determined at trial.

## **Prayer for Relief**

WHEREFORE, Plaintiff Cristy Bright respectfully requests that the Court:

A. Grant judgment in her favor on Counts I and II;

B. Award her damages in amounts to be determined at trial; and

C. Grant such other and further relief the Court deems just and proper.

Dated: February 10, 2023.

Respectfully submitted,

*/s/ James V. Cook*
LAW OFFICE OF JAMES COOK
James V. Cook (FBN 0966843)
314 W. Jefferson Street
Tallahassee, Florida 32301
Tel. (850) 222-8080
Fax (850) 561-0836
cookjv@gmail.com

-and-

*/s/ James M. Slater*
SLATER LEGAL PLLC
James M. Slater (FBN 111779)
113 S. Monroe Street
Tallahassee, Florida 32301
Tel. (305) 523-9023
james@slater.legal

*Attorneys for Plaintiff*